FILED

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA

2008 FEB 27  PM 12: 46

CASE NO.
TAMPA  DIVISION

CLE... .. ..STRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA, FLORIDA

JESSE RAYMOND ("RAY") STEWART,

8.08CV 393-T23 EAJ

Plaintiff,

vs.

COMMERCIAL VEHICLES OF SOUTH FLORIDA, INC
(F/K/A STERLING AND WESTERN STAR
TRUCKS OF TAMPA, LLC. AND
FREIGHTLINER OF TAMPA, LLC),
FREIGHTLINER LLC.,
BRADLEY W. PRIOR,
OAKLEY TRANSPORT, INC.
EDWARD R. COSTELLO, and
MELBORNE L. ("JACK") WILSON,

Defendants.

_____/

COMPLAINT UNDER 42 UNITED STATES CODE §1985(3)
AND DEMAND FOR TRIAL BY JURY

Plaintiff sues the Defendants and for his Complaint alleges:

**PARTIES**

1.      Plaintiff, JESSE RAYMOND ("RAY") STEWART (herein "STEWART")

is an individual who resides in Bessemer, Alabama. Plaintiff is African-

American.

2.       Defendant, COMMERCIAL VEHICLES OF SOUTH FLORIDA, INC,

formerly known as STERLING AND WESTERN STAR TRUCKS OF

TAMPA, LLC. AND FREIGHTLINER OF TAMPA, LLC. (herein "FREIGHTLINER OF TAMPA") is a Florida corporation doing business in the Middle District of Florida.

3.    Defendant FREIGHTLINER LLC (herein "FREIGHTLINER LLC") is a foreign corporation doing business in the Middle District of Florida.

4.    Defendant BRADLEY W. PRIOR (herein "PRIOR") is an individual residing in Lutz, Florida. During the material times of this complaint, PRIOR was General Manager of FREIGHTLINER OF TAMPA.

5.    Defendant OAKLEY TRANSPORT, INC. (herein "OAKLEY TRANSPORT") is a Florida corporation, doing business in Lake Wales, Florida.

6.    Defendant EDWARD R. COSTELLO (herein "COSTELLO") is an individual residing in Tampa, Florida. During the material times of this complaint, COSTELLO was a salesman at FREIGHTLINER OF TAMPA.

7.    Defendant MELBOURNE L. ("JACK") WILSON (herein "WILSON") is an individual residing in Memphis, Tennessee. During the material times of this complaint, WILSON was sales manager of FREIGHTLINER OF TAMPA.

## JURISDICTION AND VENUE

8.    Jurisdiction is based upon the provisions of Title 28, United States Code, §1331 and §1343 in that the cause arises under a certain provision of an

Act of Congress pertaining to civil rights, namely the Civil Rights Act of

1871, 42 U.S.C. §§1985(3).

## GENERAL ALLEGATIONS

9.      STEWART was employed by DaimlerChrysler Financial Services (herein

"DCFS")as a District Finance Manager from 1997 to 2005.

10.     Beginning in 2000 STEWART was assigned as District Sales Manager in

Tampa, Florida. In this role he reported to Carol Dmytriw, a Regional

Finance Manger located in Duluth, Georgia.

11.     DCFS  was a subsidiary of DaimlerChrysler Services Truck Finance Both

FREIGHTLINER ( a manufacturer of trucks) and FREIGHTLINER OF

TAMPA ( a truck dealer) were direct or indirect subsidiaries of

DaimlerChrysler North America Holding although each entity was

operated as a separate business with different management and directors.

12.     DCFS described itself as the "captive" financial arm of DaimlerChrysler

much in the way Ford Motor Credit Company and General Motors

Acceptance Corporation serve as the captive financial arms of those

vehicle manufactures.

13.     STEWART's initial reviews by Dmytriw were good, and he was praised in

his 2003 evaluation for his "extremely strong dealer relationships",

"excellent level of service to his dealers and customers" and his

"dedication and dependability to satisfy his customer's demands". His

3

review reflected that he had "Exceeded By Far" the goals set for him during the year.

14. One of STEWART's customers in 2003 was OAKLEY TRANSPORT. In that year he financed forty trucks for its operation.

15. Sometime in early 2004, OAKLEY TRANSPORT began refusing to return STEWART's calls.

16. When PRIOR was general manager of only the Sterling dealership he began requiring that STEWART be accompanied by one of his salespersons when calling on any of the dealership's customers.

17. FREIGHTLINER OF TAMPA (inclusive of both dealerships) had twenty to twenty-five salesmen. Not of member of its sales force was African-American, nor had the dealerships ever employed any African-American in its sales force. In fact, all of the African-American employees of the dealership worked in "back of the house" positions in parts and service.

18. The practical effect of PRIOR's directive was to present at least one white face to the dealer's customers since all the sales representatives were white.

19. At a time in the early winter of 2004 COSTELLO met with officials of OAKLEY TRANSPORT.

20. While the details of that meeting are unknown to STEWART what is known shows the existence of an agreement between COSTELLO, FREIGHTLINER OF TAMPA and OAKLEY TRANSPORT for

4

OAKLEY to refuse to do business with STEWART on account of his race, and have FREIGHTLINER OF TAMPA to endeavor to have DCFS replace STEWART as District Finance Manager with a white person.

21.   Incident to that agreement COSTELLO told WILSON that OAKLEY TRANSPORT would not do business with STEWART on account of his race.

22.   WILSON was nominally COSTELLO'S supervisor, but COSTELLO was considered untouchable by WILSON because of COSTELLO's longtime relationship with Mark Lampert the National Sales Manager of FREIGHTLINER.

23.   WILSON was dispatched to tell Carol Dmytriw that customers did not want to do business with STEWART.

24.   WILSON, in mid to late February 2004, instead told Dmytriw that COSTELLO and OAKLEY TRANSPORT did not want to do business with STEWART "on account he was colored."

25.   WILSON's approach to Dmytriw did not have the original desired effect, probably because of his admission that the underlying reasons were unlawful, and perhaps because STEWART was coming off an outstanding year.

26.   Dmytriw told WILSON that that was unacceptable, and that COSTELLO should be told that STEWART's race should not be an issue.

27.   WILSON agreed to tell COSTELLO that race should not be a factor.

5

28. Notwithstanding, or perhaps because of, his promise to Dmytriw to talk to COSTELLO, WILSON decided on a different approach.

29. Shortly before a meeting on March 2, 2004 at the FREIGHTLINER OF TAMPA offices, WILSON took STEWART aside.

30. He informed STEWART that he "had never seen such an issue of blacks and whites before."

31. WILSON said that he had been in a meeting with COSTELLO and OAKLEY TRANSPORT.

32. STEWART questioned WILSON's assessment pointing out that he had placed four million dollars in financing for OAKLEY TRANSPORT the previous year.

33. WILSON replied "Ray, I want you to know for sure that the customer and Ed [COSTELLO] don't want to deal with you because you're black."

34. On March 4, 2004 after eleven p.m. STEWART sent an email to Dmytriw reporting this to her. STEWART was unaware that WILSON had told Dmytriw the same thing earlier.

35. Dmytriw had in fact told no one of conversation with WILSON prior to receiving STEWART's email. On March 5, 2004 she sent a copy of the email to Sue Ann Kainz in the Human Resources Department at DCFS.

36. On that very same day, March 5, 2004 she had a conversation with Barry Hanna, the Regional General Manager Manufacturing for FREIGHTLINER who lived in Georgia.

37.    Hanna told Dmytriw "I don't know who made the decision to send a black

man into Florida." He expressed his opinion that "Brad [PRIOR] and Ed

[COSTELLO] are bigots." Finally he warned her that Florida was a racist

state and that "it was not like Georgia."

38.    On March 9, 2004, Kainz turned all of the information she received from

Dmytriw to FREIGHTLINER, deferring to them to conduct an

investigation.

39.    On March 10, 2004 Dmytriw received two voice messages from

WILSON, whose tone  according to Dmytriw "sounded urgent."

40.    When WILSON reached her, he wanted to know if Dmytriw had heard

from Human Resources and offered a substantially different version of his

conversation with STEWART which negated any racial motivation by any

one at the dealership or any of its customers.

41.    Dmytriw reported to Kainz the change in the story WILSON was now

telling, and how it contradicted both the statements to her and STEWART

made by WILSON and documented by each..

42.    Notwithstanding this inconsistency and even though FREIGHTLINER

had only been given STEWART's complaint the previous day for

investigation she and WILSON agreed that STEWART would be removed

as District Finance Manager and replaced with a white person.

43.    On March 10, 2004, approximately twenty-four hours after the

STEWART complaint was sent to FREIGHTLINER and in spite of the

confirmation of STEWART's allegations by Dmytriw who is a regional official in the DaimlerChyrsler organization, FREIGHTLINER reported to Kainz verbally that it could find no substantiation of any of STEWART's complaint.

44.   On March 11, 2004, FREIGHTLINER formally responded to the STEWART complaint although STEWART would not be notified of its contents.

45.   The FREIGHTLINER investigator stated "I was not able to discover even a single incident, or comment that would tend to support Stewart's allegations that his race is a factor in any management or customer relations."

46.   The FREIGHTLINER "investigation" was in fact a thinly veiled effort to provide support for the efforts of FREIGHTLINER OF TAMPA, OAKLEY TRANSPORT, COSTELLO and WILSON's efforts to remove STEWART from his position as District Finance Manager.

47.   STEWART in fact was not told that the investigation was completed until March 30, 2004, and was told only that "appropriate action" had been taken."

48.   STEWART was removed from the Tampa area job and replaced with a white man by Dmytriw.


## COUNT ONE-CONSPIRACY UNDER §1985(3)

8

49.    42 United States Code §1985(3) (herein the "1985 Conspiracy") provides

in pertinent part:

> (3) Depriving persons of rights or privileges
>
> If two or more persons in any State or Territory conspire... for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws... in any case of conspiracy set forth in this section, if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages occasioned by such injury or deprivation, against any one or more of the conspirators.

50.    The following Defendants (herein the "1985 Conspirators") are member of

the 1985 Conspiracy:

(a)    WILSON

(b)    COSTELLO

(c)    OAKLEY TRANSPORT

(d)    FREIGHTLINER OF TAMPA

(e)    FREIGHTLINER

(f)    PRIOR

53.    The object of the conspiracy was to remove STEWART from servicing

OAKLEY TRANSPORT and other customers of FREIGHTLINER OF

TAMPA on account of his race.

54.    The overt acts taken in support of the conspiracy include, but are not

limited to, the acts described in the following enumerated paragraphs

herein:  19-33, 39-48.

9

55.     By engaging in the 1985 Conspiracy these Defendants endeavored and
        succeeded in restricting STEWART's right to make and enforce contracts,
        including contracts made with his employer DCFS, in violation of federal
        laws including but not limited to 42 United States Code §1981 and the
        Thirteenth  and Fourteenth Amendments to the Constitution of the United
        States, relating to equal protection of the laws and the badges of slavery.

56.     As a direct and proximate result of the actions of the 1985 Conspirators
        Plaintiff has been caused to suffer extreme and prolonged emotional and
        mental distress and anguish, has been caused to incur medical expense in
        relationship to such mental suffering, and has sustained serious and
        continuing economic loss of income and earning capacity.

57.     The actions of the 1985 Conspirators were willful, wanton and in complete
        and knowing violation of STEWART's federally protected rights so as to
        justify the assessment of punitive damages both as a deterrent to the 1985
        Conspirators and as a warning to those who may engage in such actions in
        the future.

58.     Plaintiff has engaged undersigned counsel and is entitled to an award of
        his fees and costs pursuant to 42 U.S.C. §1988.

WHEREFORE Plaintiff STEWART seeks the following relief against the 1985
Conspirators:

        (a)     Entry of a judgment for compensatory damages in favor of
                STEWART and against the 1985 Conspirators in an amount to be
                determined by a jury

(b)     Entry of a judgment for punitive damages in favor of STEWART and against the 1985 Conspirators in an amount to be determined by a jury

(c)     Entry of a declaration that the 1985 Conspirators unlawfully engaged in a conspiracy to deprive STEWART of federally protected rights

(d)     Award STEWART his fees and costs of action including expert witness fees under §1988.

(e)     Grant such other and further relief as the Court may deem proper.


## DEMAND FOR JURY TRIAL


Plaintiff demands trial by jury as to all claims so triable as a matter of right.


CORNELL & ASSOCIATES, P.A.
Attorneys for the Plaintiff
Weston Town Center Executive
1792 Bell Tower Lane
Weston, FL 33326

Telephone:  (954) 524-2703
Facsimile:  (954) 523-2706

BY:
G. WARE CORNELL, JR.
Florida Bar No. 203920
warecornell@gmail.com

11